IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| ALOHA PETROLEUM, LTD., | CIVIL NO. 1:22-cv-00372-JAO-WRP (Contract) |
| Plaintiff, | |
| | **MEMORANDUM IN SUPPORT OF MOTION** |
| v. | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and AMERICAN HOME ASSURANCE COMPANY | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................1

II.  LEGAL STANDARDS ..........................................................................3

    A.  Summary judgment standard..............................................................3

    B.  Interpretation of insurance policies under Hawaiʻi law ......................4

    C.  The duty to defend under Hawaiʻi law.................................................5

III.  ARGUMENT..........................................................................................6

    A.  There is a "Possibility of Coverage" of the Climate Lawsuits under the 1986, 1987 and First and Second 1988 National Union Policies, which Triggers the Duty to Defend............................6

        1.  The Climate Lawsuits raise the possibility of a covered "occurrence"...................................................................................7

        2.  The underlying complaints allege "property damage" caused by an "occurrence," satisfying that aspect of coverage under the policies.......................................................14

        3.  The underlying complaints allege "damages" "because of" "property damage"...........................................................16

        4.  AIG has acknowledged the possibility of coverage under the 1986, 1987, and First and Second 1988 National Union Policies .....................................................................17

    B.  The Climate Lawsuits are Possibly Covered by Additional AIG Policies under which AIG has Denied Coverage on the Basis of the Pollution Exclusion, and thus AIG has a Duty to Defend Aloha .................................................................................................18

        1.  The Climate Lawsuits raise the possibility of a covered "occurrence"...................................................................................20

        2.  The underlying complaints allege "property damage" caused by an "occurrence"...................................................20

        3.  The underlying complaints allege "damages" "because of" "property damage"...........................................................21

# TABLE OF CONTENTS
### (continued)

Page

4. Because Hawai'i Courts have not weighed in on the national dispute as to whether the pollution exclusion applies only to "traditional" environmental pollution, there is a possibility that the pollution exclusion does not bar coverage ..............................................................................22

IV. CONCLUSION.............................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aana v. Pioneer Hi-Bred Int'l, Inc.*,
No. CIV. 12-00231 LEK, 2015 WL 181764 (D. Haw. Jan. 14,
2015) ................................................................................................................10

*Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*,
828 N.E.2d 1092, 1104 (Ill. 2005) ................................................................18

*AIG Prop. Cas. Co. v. Anenberg*,
No. CV 19-00679 JMS-WRP, 2020 WL 4607839 (D. Haw. Aug.
11, 2020) .........................................................................................................12

*Apana v. TIG Ins. Co.*,
504 F. Supp. 2d 998 (D. Haw. 2007) ..............................................................24

*Apana v. TIG Ins. Co.*,
574 F.3d 679 (9th Cir. 2009) .....................................................................23, 24

*Ass'n of Apartment Owners of the Moorings, Inc. v. Dongbu Ins. Co.*,
No. 15-00497 BMK, 2016 WL 4424952 (D. Haw. Aug. 18, 2016),
*aff'd sub nom.*, 731 F. App'x. 713 (9th Cir. 2018)...........................................16

*Burlington Ins. Co. v. Oceanic Design & Constr. Inc.*,
383 F.3d 940 (9th Cir. 2004) ........................................................................4, 5

*Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*,
948 A.2d 834 (Pa. Super. Ct. 2008), *aff'd*, 2 A.3d 526 (Pa. 2010) ..............18, 23

*Clarendon Nat'l. Ins. Co. v. Smead*,
No. CIV. 06-00434SOM/BMK, 2007 WL 1670112 (D. Haw. June
7, 2007) .............................................................................................................9

*Com. & Indus. Ins. Co. v. Bank of Haw.*,
832 P.2d 733 (Haw. 1992) ...........................................................................6, 7

*Dairy Rd. Partners v. Island Ins. Co.*,
992 P.2d 93 (Haw. 2000) ......................................................................3, 6, 13

*Grp. Builders, Inc. v. Admiral Ins. Co.*,
No. 29729, 2013 WL 1579600 (Haw. Ct. App. Apr. 15, 2013) ........................ 15

*Hanna v. Plumer*,
380 U.S. 460 (1965) .................................................................................... 4

*Hawaiian Holiday Macadamia Nut Co. v. Indus. Indem. Co.*,
872 P.2d 230 (Haw. 1994) .......................................................................... 8

*Kowalski v. Mommy Gina Tuna Res.*,
574 F. Supp. 2d 1160 (D. Haw. 2008) ......................................................... 4

*Lee Ching v. Loo Dung*,
446 P.3d 1016 (Haw. Ct. App. 2019), *rev'd on other grounds sub*
*nom. Ching v. Dung*, 477 P.3d 856 (Haw. 2020) ....................................... 10

*MacKinnon v. Truck Ins. Exch.*,
73 P.3d 1205 (Cal. 2003) ........................................................................... 23

*Mullaney v. Hilton Hotels Corp.*,
634 F. Supp. 2d 1130 (D. Haw. 2009) ........................................................ 9

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000) .................................................................... 4

*Sentinel Ins. Co, Ltd. v. First Ins. Co. of Haw., Ltd.*, 875 P.2d 894
(Haw. 1994) .............................................................................................. 24

*Spittler v. Charbonneau*,
449 P.3d 1202 (Haw. Ct. App. 2019) .......................................................... 11

*Ticor Title Ins. Co. of Cal. v. Am. Res., Inc.*,
859 F.2d 772 (9th Cir. 1988) ................................................................. 4, 5

*Tri–S Corp. v. W. World Ins. Co.*,
135 P.3d 82 (Haw. 2006) .............................................................. 4, 5, 11, 12

*U.S. Fire Ins. Co. v. Estate of Campbell*,
No. 11-00006 LEK-KSC, 2011 WL 6934566 (D. Haw. Dec. 30,
2011) ....................................................................................................... 25

**Statutes**

Haw. Rev. Stat. §702-206(3)(c) ...................................................................... 9

**Other Authorities**

Fed. R. Civ. P. 56(a)..............................................................................3

Restatement (Second) of Torts §821B (1979). ......................................11

Restatement (Second) of Torts § 822 (1979).....................................10, 11

## I.   INTRODUCTION

Plaintiff, Aloha Petroleum Ltd. ("Aloha") has filed this summary judgment motion because of the denial of a duty to defend by two of Aloha's insurers – Defendants, National Union Fire Insurance Company of Pittsburgh PA ("National Union") and American Home Assurance Company ("American Home"). Specifically, National Union and American Home, both part of the AIG Group (collectively, "AIG Insurers" or "AIG") have refused to defend Aloha under twelve of their general liability policies (the "AIG Policies") with respect to two underlying lawsuits alleging liability for the climate change effects of certain petroleum products (the "Climate Lawsuits").

The Climate Lawsuits are brought by the City and County of Honolulu and Honolulu Board of Water Supply and the County of Maui plaintiffs (collectively, "Climate Plaintiffs"), alleging that the petroleum products sold by Aloha and others, when used for their intended purposes, caused an extended chain reaction of events over a period of eight decades, thereby causing property damage to Climate Plaintiffs. The alleged links in the causal chain of events are: when Aloha's "fossil fuel products" were combusted, carbon dioxide was discharged into the atmosphere, which then caused a "greenhouse" effect in the atmosphere, which then caused a warming of the Earth, which then caused rising sea levels, disruption of the hydrologic cycle, more frequent extreme precipitation events and associated

1

flooding, and more frequent and intense heatwaves and droughts, which then allegedly caused various types of property damage to Climate Plaintiffs.

The Climate Lawsuits assert product-liability-type claims against Aloha and other defendants, including failure-to-warn claims. After Aloha was sued, it turned to its historical general liability insurer, AIG, to honor the duty to defend under the AIG Policies – policies that expressly cover product liabilities.[1] Nonetheless, AIG has refused to defend Aloha in the Climate Lawsuits under any of the AIG Policies covering Aloha in the 1980s and later in the 2000s.

AIG has flip-flopped in its position regarding why it need not defend Aloha in the Climate Lawsuits. Initially, when only one AIG policy had been located – a 1985 National Union Policy – AIG informed Aloha by letter dated April 19, 2021, that its refusal to defend was based on the applicability of the pollution exclusion in that policy, which AIG asserted precluded coverage. Aloha contested that position vigorously, given that the Climate Lawsuits were not seeking the cleanup of any environmental pollution to which that exclusion applies. Nonetheless, by this position, AIG implicitly conceded that there were no other provisions in that policy serving as a basis to deny a defense.

Subsequently, when copies of additional policies were located by AIG in the course of discovery in this case, it was learned that four of those policies (issued

---

[1] Statement of Material Facts ("SMF") ¶14.

2

from 1986 through 1988) did not contain a pollution exclusion on which AIG could deny coverage. At that point, AIG did an about-face and asserted that, with respect to those policies, there was still no duty to defend Aloha because of three other policy provisions that could not be satisfied – even though the same three policy provisions were contained in the 1985 National Union Policy, and AIG had not considered them a sufficient basis on which to deny a defense under that policy.

Under Hawaiʻi law, the duty to defend is owed if there is any **possibility, however remote,** of coverage. *Dairy Rd. Partners v. Island Ins. Co.*, 992 P.2d 93, 109 (Haw. 2000). Each of AIG's reasons for denying the duty to defend Aloha is unavailing and fails to demonstrate that it would be **impossible** for Aloha to be held liable in the underlying Climate Lawsuits on a claim covered by the AIG Policies. Accordingly, the Court should enter judgment that Aloha is entitled to a defense under each of the AIG Policies at issue.

## II.   LEGAL STANDARDS

### A. Summary judgment standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence

of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the party opposing summary judgment "to demonstrate the existence of a genuine dispute." *Kowalski v. Mommy Gina Tuna Res.*, 574 F. Supp. 2d 1160, 1162 (D. Haw. 2008).

### B. Interpretation of insurance policies under Hawaiʻi law

This is a diversity action and therefore Hawaiʻi substantive law applies. *See Hanna v. Plumer*, 380 U.S. 460, 465 (1965). "In Hawaii, the terms of an insurance policy are to be interpreted according to their plain, ordinary, and accepted sense in common speech." *Burlington Ins. Co. v. Oceanic Design & Constr. Inc.*, 383 F.3d 940, 945 (9th Cir. 2004). However, "they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer. Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson." *Tri-S Corp. v. W. World Ins. Co.*, 135 P.3d 82, 98 (Haw. 2006) (quoting *Dairy Rd. Partners*, 992 P.2d at 107).

"[The] standard of interpretation in favor of the insured is even more liberally applied when courts interpret the meaning of the policy's exclusions." *Ticor Title Ins. Co. of Cal. v. Am. Res., Inc.*, 859 F.2d 772, 776 (9th Cir. 1988) (Hawaiʻi law). "[E]xclusions must specifically delete the challenged activity from coverage . . . and

the challenged activity must be subject to no other interpretation than falling within the policy's exclusion." *Id.* (citations and quotations omitted).

### C. The duty to defend under Hawai‘i law

The Hawai‘i Supreme Court has described the duty to defend as follows:

> The obligation to defend is broader than the duty to pay claims and arises wherever there is the mere *potential* for coverage. In other words, the duty to defend rests primarily on the *possibility* that coverage exists. This possibility may be remote but if it exists, the insurer owes the insured a defense. All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured.

> Accordingly, in connection with the issue of its duty to defend, the insurer bears the burden of proving that there is no genuine issue of material fact with respect to whether a *possibility* exists that the insured would incur liability for a claim covered by the policy. In other words, the insurer is required to prove that it would be *impossible* for the claimant to prevail against the insured in the underlying lawsuit on a claim covered by the policies. Conversely, the insured's burden with respect to its motion for summary judgment is comparatively light, because it has merely to prove that a *possibility* of coverage exists.

*Tri-S Corp.*, 135 P.3d at 97 (quoting *Dairy Rd. Partners*, 992 P.2d at 107-08) (cleaned up) (emphasis in original).

"The focus is on the alleged claims and facts. . . . 'Where pleadings fail to allege any basis for recovery within the coverage clause, the insurer has no obligation to defend.'" *Oceanic Design & Const., Inc.*, 383 F.3d at 946 (quoting *Hawaiian Holiday Macadamia Nut Co. v. Indus. Indem. Co.*, 872 P.2d 230, 233 (Haw. 1994)). However, if the underlying complaint does not "clearly and unambiguously assert a covered claim," the insurer must "conduct a reasonable

5

investigation to ensure that the facts of the case do not obligate it to defend the insured." *Dairy Rd. Partners*, 992 P.2d at 109-10.

"[W]here a suit raises a potential for indemnification . . . the insurer has a duty to accept the defense of the entire suit even though other claims of the complaint fall outside the policy's coverage." *Com. & Indus. Ins. Co. v. Bank of Haw.*, 832 P.2d 733, 736 (Haw. 1992) (citation and quotations omitted).

## III.   ARGUMENT

### A. There is a "Possibility of Coverage" of the Climate Lawsuits under the 1986, 1987 and First and Second 1988 National Union Policies, which Triggers the Duty to Defend

In its most recent March 13, 2023 coverage position letter, AIG did not assert that the pollution exclusion constituted a basis for its refusal to defend under the 1986, 1987 and First and Second 1988 National Union Policies. SMF ¶44. Rather, AIG relied on three other provisions, found in the policies' insuring agreements, to deny a defense – provisions that AIG previously had not considered a sufficient basis on which to deny a defense. SMF ¶42.

The First and Second 1988 National Union Policies provide coverage under the following conditions, in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" or "property damage" must be caused by an "occurrence." The occurrence" must take place in the "coverage

territory." We will have the right and duty to defend any "suit" seeking those damages. . . .

SMF ¶13. In short, these and the other AIG Policies insure against "damages" "because of" "property damage" taking place during the policy period and caused by an "occurrence." *Id.*

As discussed below, the complaints in the Climate Lawsuits allege the possibility of: (i) a covered "occurrence;" (ii) "property damage" caused by an "occurrence;" and (iii) damages "because of" property damage. Indeed, AIG acknowledged this possibility in its April 19, 2021 coverage position letter when it did not base its refusal to defend under the 1985 National Union Policy on any of those three policy provisions, instead relying solely on that policy's pollution exclusion. Hence, AIG has a duty to defend Aloha with respect to the Climate Lawsuits under the 1986, 1987, and First and Second 1988 National Union Policies.

## 1. The Climate Lawsuits raise the possibility of a covered "occurrence"

The 1986, 1987, and First and Second 1988 National Union Policies contain two similar versions of the "occurrence" definition. The version appearing in the 1986 and 1987 Policies defines "occurrence" to mean: "*an accident, including continuous or repeated exposure to conditions, which results in bodily injury or*

property damage neither expected or intended from the standpoint of the insured."[2]
SMF ¶18. The First and Second 1988 National Union Policies define "occurrence" as *"an accident, including continuous or repeated exposure to substantially the same general harmful conditions."* SMF ¶19. Because the definitions both define "occurrence" to include an "accident," they are essentially the same for purposes of analysis here.

"The question of what is an 'accident' must be determined by addressing the question from the viewpoint of the insured." *Hawaiian Holiday Macadamia Nut Co.*, 872 P.2d at 234. For an event to be an "accident," "the injury cannot be the expected or reasonably foreseeable result of the insured's own intentional acts or omissions." *Id.*

The Climate Plaintiffs allege non-intentional conduct by Aloha, as well as causes of action that do not require intentional conduct.

### a. *The underlying complaints allege non-intentional conduct*

The underlying complaints allege not only intentional actions by Aloha and the other defendants but also negligent and reckless conduct. Those allegations of

---

[2] The 1986 and 1987 National Union Policies produced by AIG in this litigation are missing the page(s) with "Definitions." *See* Exs. 3, 4. However, these policies follow directly after (and, with respect to the 1986 National Union Policy, "renew") the 1985 National Union Policy, and contain the same insuring agreement language. SMF ¶17. Therefore, those policies would contain the same definitions as the 1985 Policy, and the analysis pertaining to any defined terms under the 1985 National Union Policy applies equally to the 1986 and 1987 Policies.

non-intentional conduct are sufficient to qualify as an "accident" under the 1986, 1987, and First and Second 1988 National Union Policies. *See Clarendon Nat'l. Ins. Co. v. Smead*, No. CIV. 06-00434SOM/BMK, 2007 WL 1670112, at *8 (D. Haw. June 7, 2007) ("Because the state court complaint clearly alleges that Defendants' actions were negligent, the court rejects [the insurer's] argument that the complaint alleges only deliberate conduct.").

For instance, the complaints in the Climate Lawsuits allege:

- Defendants, and each of them, have intentionally, **recklessly, or negligently** caused flood waters, extreme precipitation, saltwater, and other materials, to enter Plaintiffs' real property, by distributing, analyzing, recommending, merchandising, advertising, promoting, marketing, and/or selling fossil fuel products. SMF ¶30.

- Defendants had actual knowledge that their products were defective and dangerous and that they had not provided reasonable and adequate warnings against those known dangers, and **acted with conscious disregard for the probable dangerous consequences** of their conduct's and products' foreseeable impact upon the rights of others. SMF ¶30.[3]

Moreover, the underlying complaints are replete with allegations of conduct, without any corresponding allegations of intent, including product liability allegations, such as failure to warn:

---

[3] "'[R]eckless' is defined as being '[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk.'" *Mullaney v. Hilton Hotels Corp.*, 634 F. Supp. 2d 1130, 1154 (D. Haw. 2009) (quoting Black's Law Dictionary 1298); *c.f.* Haw. Rev. Stat. §702-206(3)(c) (dictating, in criminal context, "[a] person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result").

- Defendants' advertising and promotional materials fail to disclose the extreme safety risk associated with the use of Defendants' dangerous fossil fuel products, which are causing "catastrophic" climate change, as understood by Defendants' and the industry's own scientists decades ago and with the effects of global warming now being felt in the County. They continue to omit that important information to this day. SMF ¶31.

- Because of their superior knowledge of fossil fuel products, Defendants were in the best position to prevent the nuisance, but failed to do so, including by failing to warn customers, retailers, and Plaintiffs of the risks posed by their fossil fuel products, and failing to take any other precautionary measures to prevent or mitigate those known harms. SMF ¶31.

Reading these allegations in the light most favorable to coverage, as required when considering the duty to defend, it is *possible* these actions, if proven, were not intended by Aloha to cause the property damage alleged by Climate Plaintiffs, but rather may be characterized as negligent or reckless. That possibility is sufficient for purposes of triggering the duty to defend.

      *b.   The underlying complaints allege causes of action that do not require intentional conduct*

The complaints in the Climate Lawsuits allege public and private nuisance (Counts I & II),[4] strict liability failure to warn (Count III), negligent failure to warn

---

[4] The Restatement (Second) of Torts § 822, pertaining to private nuisance, explains the tortious act may be intentional or "unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." Restatement (Second) of Torts § 822 (1979). The Hawaiʻi Intermediate Court of Appeals appears to have adopted this section of the Restatement. *See Lee Ching v. Loo Dung*, 446 P.3d 1016, 1032 (Haw. Ct. App. 2019), *rev'd on other grounds sub nom. Ching v. Dung*, 477 P.3d 856 (Haw. 2020); *see also Aana v. Pioneer Hi-Bred Int'l, Inc.*, No. CIV. 12-00231 LEK, 2015 WL 181764, at *7 (D. Haw. Jan. 14, 2015) (predicting the Hawaiʻi Supreme Court would

(Count IV), and trespass (Count V),[5] SMF ¶29, which do not necessarily require proof of intentional conduct on the part of Aloha.

The underlying complaints therefore allege (1) non-intentional conduct, and (2) causes of action that may be satisfied by non-intentional conduct.

In *Tri-S Corp. v. W. World Ins. Co.*, 135 P.3d 82, 89 (Haw. 2006), the Hawaiʻi Supreme Court found an "occurrence" under similar circumstances. In that case, the underlying complaint alleged tort liability against the policyholder under an exception to workers compensation exclusivity, requiring "wilful and wanton misconduct" in breaching the duty to provide a safe workplace. *Id.* at 88. The Court concluded that the insurer's reading of the complaint was "incomplete" where the insurer "fail[ed] to recognize the assertion of *non-intentional* misconduct also included in the complaint's allegations of 'wilful and wanton misconduct' and negligence." *Id.* at 103 (emphasis in original). Because "wilful and wanton misconduct" did not require a specific intent to cause injury, but rather included recklessness and simple negligence, there was a possibility that the underlying

---

adopt section). Comment e to Restatement § 821B, pertaining to public nuisance, suggests that this § 822 intent requirement applies to public nuisance as well. *See* Restatement (Second) of Torts §821B, cmt. e (1979).

[5] Restatement (Second) of Torts § 165, pertaining to non-intentional trespass, explains the tortious act may be reckless or negligent, "or as a result of an abnormally dangerous activity." *See Spittler v. Charbonneau*, 449 P.3d 1202, 1208 (Haw. Ct. App. 2019) (noting that "in cases involving claims of trespass we have referred to the Restatement (Second) of Torts").

plaintiff could prevail "on a 'willful and wanton' misconduct claim based upon evidence only of non-intentional misconduct because the possibility exist[ed] that [the policyholder] could be found liable for recklessness[.]" *Id.* The Court emphasized that: "it bears repeating that the duty to defend rests primarily on the *possibility* that coverage exists. This possibility may be remote but if it exists, the insurer owes the insured a defense." *Id.* at 102-03.

Because the complaints in the Climate Lawsuits allege that Aloha and the other defendants engaged in non-intentional conduct giving rise to harm, the possibility of an "occurrence" exists, and AIG cannot avoid its duty to defend by asserting the absence of an occurrence.

### c. A reasonable investigation of Climate Plaintiffs' allegations reveals the possibility of a covered occurrence

As described above, the allegations of non-intentional conduct and corresponding causes of action end the inquiry regarding the duty to defend. Moreover, parallel allegations of intentional conduct with foreseeable harms do not disturb that conclusion. *See AIG Prop. Cas. Co. v. Anenberg*, No. CV 19-00679 JMS-WRP, 2020 WL 4607839, at *8 (D. Haw. Aug. 11, 2020) ("It's certainly possible for a jury in [the underlying action] to find [the policyholder] liable for *both* NIED *and* intentional torts based on different actions.").

Even assuming *arguendo* that the underlying complaints were deemed ambiguous regarding whether they have alleged covered claims in light of their

additional allegations of intentional conduct with foreseeable harms, a reasonable investigation by AIG is required before AIG may deny its duty to defend. *Dairy Rd. Partners*, 992 P.2d at 109-10.  Such a reasonable investigation, if conducted by AIG, would reveal the possibility that Aloha would not be found to have expected or reasonably foreseen the property damage alleged by the Climate Plaintiffs arising from Aloha's sale of gasoline products.

The underlying complaints make no specific allegations about Aloha in particular (as opposed to all defendants collectively) having had knowledge of any dangers arising from the sale and use of fossil fuels. Moreover, a reasonable investigation would show that, during the period of the AIG policies, Aloha was a local marketer of gasoline products on the islands, and not a national or international player in the oil industry.[6] Thus, it is certainly possible that Aloha would be found not to have had knowledge of the industry information that is alleged by the Climate Plaintiffs as the basis for "foreseeability" of harm from selling fossil fuels.[7]

---

[6] In the underlying complaints, Climate Plaintiffs attempt to impute oil industry knowledge to Aloha by virtue of its association with Sunoco (SMF ¶32) and/or Phillips 66 (SMF ¶33), but a reasonable investigation would disclose that Aloha was first incorporated as a Hawaiʻi corporation by independent incorporators in 1977 unrelated to any of the other defendants in the Climate Lawsuits and it thereafter purchased certain assets from Phillips 66, and that Aloha was never owned by or affiliated with Phillips 66. SMF ¶35.  Moreover, Aloha was not subsequently acquired by Sunoco until 2014 (SMF ¶34), well after the AIG policy periods at issue.
[7] In the underlying Climate Lawsuits, Aloha raises as an affirmative defense of unforeseeable intervening actions and forces. SMF ¶36.

### 2. The underlying complaints allege "property damage" caused by an "occurrence," satisfying that aspect of coverage under the policies

There are two versions of the "property damage" definition between the 1986, 1987, and First and Second 1988 National Union Policies. The 1986 and 1987 Policies define "property damage" in relevant part as: "*physical injury to or destruction of tangible property which occurs during the policy period.*"[8] SMF ¶20. The First and Second 1988 National Union Policies define "property damage" in relevant part as: "Physical injury to tangible property, including all resulting loss of use of that property[.]" SMF ¶21. Either under the insuring agreement or the definition itself, both specify that the "property damage" take place "during the policy period" and be caused by an "occurrence." SMF ¶20, 13.

For purposes of summary judgment here, the differences in wording of the "property damage" definition among these four National Union Policies are immaterial for duty-to-defend purposes, and therefore Aloha does not distinguish between them.

The AIG Insurers correctly conceded in their March 13, 2023 letter that "property damage" was alleged. SMF ¶37. Although the complaints in the Climate Lawsuits allege some property damage occurring at specific times outside of the

---

[8] *See supra*, note 2, with respect to the 1986 and 1987 National Union Policies following the definitions included in the prior-year 1985 Policy.

policy periods,[9] *see, e.g.*, Ex.15 at ¶152.a. (2018 destruction of drainway), Ex. 16 at

¶197 (2018 damaged road), they also allege generalized property damage without

specifying the timing of that damage in any particular year(s) during the 1965-to-

present time frame of the Lawsuits:

- "Saltwater intrusion and coastal erosion due to sea level rise has further reduced available freshwater resources and damages drinking water delivery infrastructure, including by corrosion and inundation." SMF ¶38.

- "The County's property and resources have been and will continue to be inundated and/or flooded by sea water and extreme precipitation, among other climate-change related intrusions, causing injury and damages thereto[.]" SMF 3¶8.

Viewed in the light most favorable to coverage, the absence of a specific time

period in these and other allegations means it is *possible* that the alleged property

damage occurred during the relevant policy periods. *See Grp. Builders, Inc. v.

Admiral Ins. Co.*, No. 29729, 2013 WL 1579600, at *8 (Haw. Ct. App. Apr. 15,

2013) (finding possibility that property damage was caused by an occurrence during

the policy period where the "complaint [did] not specify when the mold growth

began, when any property damage occurred, or what caused the mold to grow").

This conclusion is bolstered by the allegations in the Climate Lawsuit

complaints of ongoing emissions since at least the 1950s, and that no particular CO2

---

[9] For those National Union policies under which AIG did not deny a defense based on the pollution exclusion, the relevant timeframe is 1986-1988.

molecule can be traced to any particular source. SMF ¶39. Under well-established Hawaiʻi law, that is all that is required to allege the possibility of property damage during the policy periods and trigger AIG's duty to defend.

### 3. The underlying complaints allege "damages" "because of" "property damage"

The 1986, 1987, and First and Second 1988 National Union Policies state that they provide coverage for sums the insured becomes "legally obligated to pay as damages because of" property damage. SMF ¶13.

Looking to the "ordinary and popular definition" of "damages," this Court has defined "damages" as "any remunerative payment made to an aggrieved party, including restitutive and punitive measures." *Ass'n of Apartment Owners of the Moorings, Inc. v. Dongbu Ins. Co.*, No. 15-00497 BMK, 2016 WL 4424952, at *4 (D. Haw. Aug. 18, 2016) (quoting *APL Co. v. Valley Force Ins. Co.*, 754 F.2d 1094 (N.D. Cal. 2010)), *aff'd sub nom. Ass'n of Apartment Owners of Moorings, Inc. v. Dongbu Ins. Co.*, 731 F. App'x. 713 (9th Cir. 2018).

It has further defined "because of" as "'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from.'" *Id.* (quoting *C. Brewer & Co., v. Marine Indem. Ins. Co. of Am.*, 347 P.3d 163, 166 (Haw. 2015)) (borrowing definition of "synonymous term 'arising out of'"); *see also Ass'n of Apartment Owners of Moorings, Inc.*, 731 F. App'x. at 714 ("This phrase, which is undefined, connotes a

non-exacting causation requirement whereby any award of damages that flows from covered property damage is covered, unless otherwise excluded.").

The complaints in the Climate Lawsuits plainly seek from Aloha and others "damages" "because of" "property damage," as this Court has defined those terms. The underlying complaints request unspecified "compensatory damages" in the prayer of relief. SMF ¶40. And it is certainly *possible* that those compensatory damages are for "property damage" caused by an occurrence during the policy periods – for instance, to compensate for the fact that "[the Honolulu Board of Water Supply] . . . *must repair infrastructure damaged as a result of Defendants' conduct*." Ex. 15 at ¶18 (emphasis added).

In short, the complaints in the Climate Lawsuits clearly allege the *possibility* that Aloha could be liable for "damages" "because of" "property damage" occurring during the relevant policy periods caused by an "occurrence."

### 4. AIG has acknowledged the possibility of coverage under the 1986, 1987, and First and Second 1988 National Union Policies

In its April 19, 2021 coverage position letter, National Union asserted that it was denying coverage under the 1985 National Union Policy (then, the only AIG policy located) based solely on its application of the pollution exclusion. SMF ¶41-42. National Union explained: "additional provisions of the [1985 National Union Policy] *may* serve to limit or preclude coverage," but did not deny a defense under

those provisions. SMF ¶43 (emphasis added). Included in those provisions on which AIG was reserving its rights, but not denying a duty to defend, were those based on a lack of "damages" "because of" "property damage" occurring during the policy periods caused by an "occurrence." SMF ¶42; Ex. 13 at 3-6.

Critically, AIG's use of the word "may" acknowledges uncertainty about whether those coverage provisions are or are not satisfied. Under Hawai'i law, because only a *possibility* of coverage is required, National Union's uncertainty establishes a duty to defend. *Accord Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1104 (Ill. 2005) ("Gainsco's reservation of rights letter stated that 'the claim *may not be* covered under the Policy.' Given this uncertainty, Gainsco correctly agreed to pay Midwest's defense costs in the underlying action and sought a declaratory judgment that it did not owe Midwest a defense.") (emphasis added); *c.f. Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 948 A.2d 834, 852 (Pa. Super. Ct. 2008) ("Royal was also uncertain as to coverage and indicated in its letters that there *may be* coverage, thereby conceding that there was potential coverage. Accordingly, its duty to defend was triggered[.]") (emphasis added), *aff'd*, 2 A.3d 526 (Pa. 2010).

**B. The Climate Lawsuits are Possibly Covered by Additional AIG Policies under which AIG has Denied Coverage on the Basis of the Pollution Exclusion, and thus AIG has a Duty to Defend Aloha**

There are three versions of the insuring agreement language relevant to the 1984, 1985, 2008, and 2009 National Union Policies, and the 2004, 2005, 2006, and 2007 American Home Policies – which are the policies under which AIG has denied a defense based on the pollution exclusion. SMF ¶13, 44. For purposes of summary judgment on the duty to defend, the differences between insuring language in these eight AIG Policies and that of the First and Second 1988 National Union Policies, quoted above, are immaterial.

As an initial matter, as with the 1986, 1987, and First and Second 1988 National Union Policies, the complaints in the Climate Lawsuits allege a covered occurrence, property damage caused by an occurrence, and damages because of property damage, sufficient to satisfy those coverage provisions of the 1984, 1985, 2008, and 2009 National Union Policies, and the 2004, 2005, 2006, and 2007 American Home Policies. Further, it is possible that the pollution exclusions in these eight policies do not bar coverage for the Climate Lawsuits, in light of the "legal uncertainty" surrounding the scope of that exclusion. For that reason, AIG also owes Aloha a defense under these policies.

### 1. The Climate Lawsuits raise the possibility of a covered "occurrence"

The 1984,[10] 1985, 2008, and 2009 National Union Policies, and the 2004, 2005, 2006, and 2007 American Home Policies share the same two definitions of "occurrence" as contained in the 1986, 1987, and First and Second 1988 National Union Policies. SMF ¶18, 19. Thus, for the reasons set forth above, the complaints in the Climate Lawsuits allege non-intentional conduct and causes of action that do not require intentional conduct. Moreover, as it concerns allegations of intentional acts or omissions, it is possible that Aloha will be found not to have expected or foreseen the property damage claimed by the underlying Climate Plaintiffs. Accordingly, an "accident" – and hence an "occurrence"– potentially exists, triggering AIG's duty to defend. *See supra* Section III.A.1.

### 2. The underlying complaints allege "property damage" caused by an "occurrence"

There are two versions of the "property damage" definition among the 1984,[11] 1985, 2008, and 2009 National Union Policies, and the 2004, 2005, 2006, and 2007 American Home Policies. The 1984 and 1985 National Union Policies have the same

---

[10] The 1984 National Union Policy produced by the AIG Insurers in this litigation is missing the "Definitions" section. However, this policy is expressly "renewed" by the 1985 National Union Policy for which the "Definitions" section is available. SMF ¶16. Thus, one can look to the 1985 Policy for the Definitions applicable to the 1984 Policy.

[11] SMF ¶20-22.

definition as the 1986 and 1987 National Union Policies. SMF ¶20. The remaining policies define it, in relevant part, as: "Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it[.]" SMF ¶22. Again, for purposes of summary judgment here, any differences in the language of these definitions are immaterial.

The allegations in the Climate Lawsuits complaints regarding the damage suffered by the Climate Plaintiffs for which liability is sought to be imposed against Aloha easily satisfies the definitions of "property damage" in these Policies. *See supra* Section III.A.2.

### 3. The underlying complaints allege "damages" "because of" "property damage"

The 1984, 1985, 2008, and 2009 National Union Policies, and the 2004, 2005, 2006, and 2007 American Home Policies, all provide coverage for sums the insured becomes "legally obligated to pay as damages because of" property damage. SMF ¶13.

For each of these policies, the analysis is the same, and for the reasons set forth above regarding the 1986, 1987 and 1988 National Union Policies, the complaints in the Climate Lawsuits clearly allege the *possibility* that Aloha could be liable for "damages because of property damage" occurring during the policy periods and caused by an occurrence. *See supra* Section III.A.3. Accordingly, AIG

cannot avoid its duty to defend Aloha under the 1984, 1985, 2008, and 2009 National Union Policies, and the 2004, 2005, 2006, and 2007 American Home Policies based on any of these three policy provisions.

### 4. Because Hawaiʻi Courts have not weighed in on the national dispute as to whether the pollution exclusion applies only to "traditional" environmental pollution, there is a possibility that the pollution exclusion does not bar coverage

AIG has denied coverage under eight AIG Policies containing two different versions of the pollution exclusion. The 1984 and the 1985 National Union Policies contain the so-called "qualified" or "sudden and accidental" pollution exclusion. SMF ¶23. The 2008 and 2009 National Union Policies, and the 2004, 2005, 2006, and 2007 American Home Policies, contain the "total" pollution exclusion. SMF ¶24. For example, the total pollution exclusion provides:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

*Id.* Further, the National Union and American Home Policies with the total pollution exclusion define "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." SMF ¶25. Certain courts have interpreted the language of the pollution exclusion to apply to liabilities for clean-up of pollutants that have been discharged into the environment (circumstances not applicable to this case). *See, e.g., MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1211 (Cal. 2003) (the "available evidence most strongly suggests that the absolute pollution exclusion was designed to serve the twin purposes of eliminating coverage for gradual environmental degradation and government-mandated cleanup such as Superfund response cost reimbursement"); *Apana v. TIG Ins. Co.*, 574 F.3d 679, 682 (9th Cir. 2009) (noting the courts that have "limited the exclusion to situations involving traditional environmental pollution").

For purposes of this motion, the differences between the qualified and total pollution exclusions are immaterial – that is, coverage for the Climate Lawsuits is not precluded by either form of pollution exclusion because the exclusions apply only to liability for cleanup of "traditional" environmental pollution arising from the discharge of pollutants from a contained area into the environment – and not to

23

claims predicated on the ordinary and intended use of a policyholder's product, and in particular, in this case, where the Climate Plaintiffs are not seeking to have Aloha clean-up any alleged environmental  contamination.

The Hawai'i Supreme Court has explained that, under what has been referred to as the "legal uncertainty" rule, where "there is a notable dispute nationwide" and "significant conflict among jurisdictions" as to the interpretation of an insurance policy provision, "[t]he mere fact" that Hawai'i courts have not "conclusively answered" the question proves coverage is a possibility. *See Sentinel Ins. Co, Ltd. v. First Ins. Co. of Haw., Ltd.*, 875 P.2d 894, 907 (Haw. 1994) (holding duty to defend triggered, regardless of what events triggered coverage and regardless of whether insurers were jointly and severally liable, because legal uncertainty existed).

The application of this rule here is uncontroversial. Whether the pollution exclusion applies only to "traditional" environmental pollution is a question Hawai'i courts have not answered and is one that has been "repeatedly litigated, spawning conflicting judicial decisions throughout the country." *See Apana*, 574 F.3d at 682 (collecting cases on both views and certifying question to Hawai'i Supreme Court).[12]

Indeed, Judge Seabright has applied the legal uncertainty rule to this very question of the applicability of a pollution exclusion and held that, as a result, an insurer had a duty to defend. *See Apana v. TIG Ins. Co.*, 504 F. Supp. 2d 998, 1004

---

[12] The parties settled before the Hawai'i Supreme Court ruled on the issue.

(D. Haw. 2007) (denying insurer motion for summary judgment regarding duty to defend based on legal uncertainty surrounding applicability of total pollution exclusion).

Accordingly, under the legal uncertainty rule, this question raises a possibility of coverage. That possibility precludes AIG from escaping the duty to defend Aloha based on the pollution exclusion.[13]

---

[13] The differences between the language of the qualified and total pollution exclusions are immaterial in view of the legal uncertainty rule and whether the exclusions apply to traditional environmental pollution. The qualified pollution exclusion's "sudden and accidental" exception does, however, arguably mean "unexpected and unintended" under Hawaiʻi law, *see U.S. Fire Ins. Co. v. Estate of Campbell*, No. 11–00006 LEK–KSC, 2011 WL 6934566 (D. Haw. Dec. 30, 2011), and hence this exception to the exclusion is satisfied for the same reasons as the definition of "occurrence" in the policies is satisfied. *See supra* Section III.A.1.

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant Aloha's motion for partial summary judgment on the duty to defend with respect to the twelve AIG Policies at issue.

DATED:  Honolulu, Hawaiʻi, June 2, 2023.

CADES SCHUTTE
A Limited Liability Law Partnership


/s/ *C. Michael Heihre*
C. MICHAEL HEIHRE
MICHI MOMOSE

JOHN M. SYLVESTER (PRO HAC)
HUDSON STONER (PRO HAC)
K&L GATES LLP

Attorneys for Plaintiff
ALOHA PETROLEUM, LTD.