IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ALOHA PETROLEUM, LTD.,<br><br>               Plaintiff,<br><br>  vs.<br><br>NATIONAL UNION FIRE<br>INSURANCE COMPANY OF<br>PITTSBURGH, PA, and AMERICAN<br>HOME ASSURANCE COMPANY<br>Defendants,<br><br>               Defendants. | CIV. NO. 22-00372 JAO-WRP<br><br>ORDER GRANTING PLAINTIFF'S<br>MOTION FOR PARTIAL<br>SUMMARY JUDGMENT<br>REGARDING DUTY TO DEFEND,<br>ECF NO. 114, AND DENYING<br>DEFENDANTS' SUPPLEMENTAL<br>MOTION FOR PARTIAL<br>SUMMARY JUDGMENT, ECF NO.<br>113 |

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT REGARDING DUTY TO DEFEND, ECF NO. 114, AND
DENYING DEFENDANTS' SUPPLEMENTAL MOTION FOR PARTIAL
SUMMARY JUDGMENT, ECF NO. 113**

In this insurance coverage case, Plaintiff Aloha Petroleum, Ltd. ("Aloha")

asserts that Defendants National Union Fire Insurance Company of Pittsburgh, PA,

("NUFIC") and American Home Assurance Company ("AHAC") (collectively,

"AIG" or the "AIG insurers")[1] have a duty to defend Aloha against a pair of

---

[1] NUFIC and AHAC are wholly owned subsidiaries of AIG Property Casualty US
Inc. and are jointly represented by the same attorneys. *Compare* ECF No. 60
(NUFIC's Amended Corporate Disclosure Statement), *with* ECF No. 61 (AHAC's
Corporate Disclosure Statement). Further, both refer to their insurance contracts
with Aloha as the "AIG Policies." ECF No. 56-1 at 10.

underlying climate change related lawsuits in Hawaiʻi state courts.  ECF No. 1.

The Court previously determined that AIG did not have a duty to defend under ten of the twelve insurance policies in this case because of an applicable pollution exclusion.  *See* ECF No. 118.  The two remaining policies, which NUFIC issued, lack that exclusion.  Now before the Court are the parties' cross-motions for partial summary judgment on the duty to defend under those two policies.  *See* ECF No. 113 ("NUFIC Motion"); ECF No. 114 ("Aloha Motion").

The Court finds NUFIC has a duty to defend under the two remaining policies and thus GRANTS the Aloha Motion and DENIES the NUFIC Motion.

## I.  BACKGROUND

Aloha filed its First Amended Complaint in this case on April 28, 2023, alleging diversity jurisdiction over, among other things, breach of contract claims against the out-of-state AIG insurers for failing to defend Aloha against two climate change lawsuits:  *County of Maui v. Sunoco LP*, No. CV-20-0000283, Dkt. No. 1 (Haw. 2d Cir. filed Oct. 12, 2020) (the "*Maui* complaint," available at ECF No. 55-17), and *City and County of Honolulu v. Sunoco LP*, No. CV-20-0000380, Dkt. No. 1 (Haw. 1st Cir. filed Mar. 22, 2021) (the "*Honolulu* complaint," available at ECF No. 55-16) (collectively, the "underlying lawsuits" or the "underlying complaints").  Aloha principally requests a declaratory judgment that

each of the AIG insurers have a duty to defend in the underlying lawsuits. *See* ECF No. 47 at 2, 25.

The underlying lawsuits are substantially similar. They assert the same legal claims against the same entity defendants—including Aloha—in complaints that span over 100 pages. The Court summarizes those suits together, citing relevant portions of both complaints, with an eye toward the relevant legal disputes in this case.

## A.    The Underlying Lawsuits

The *Maui* and *Honolulu* complaints are brought against "major corporate members of the fossil fuel industry [that] have known for nearly half a century that unrestricted production and use of fossil fuel products create greenhouse gas pollution that warms the planet and changes our climate." *Maui* complaint ¶ 1; *Honolulu* complaint ¶ 1. Aloha is named as a defendant in both underlying lawsuits and is alleged to be a current subsidiary of Sunoco LP. *See Maui* complaint ¶ 20, *Honolulu* complaint ¶ 20.

Generally, the underlying complaints aver that the defendants there "knew or should have known, based on information passed to them from their internal [teams], [and outside] groups," that use of their products would result in injuries to the counties, and they could have "warn[ed] [the public] of [the] known consequences following from the intended and foreseeable use of their products

3

and work[ed] to minimize the damage associated with the use and combustion of such products." *Maui* complaint ¶ 8; *Honolulu* complaint ¶ 8. In other words, they say the "impacts of [the defendants'] fossil fuel products on the Earth's climate and associated harms to people and communities"—including tangible property harms to the counties—were "foreseeable" to the defendants. *Maui* complaint ¶ 103; *Honolulu* complaint ¶ 94; *see also Maui* complaint ¶ 148 (alleging the defendants' "knowledge of the foreseeable harms associated with the consumption of [their] fossil fuel products"); *Honolulu* complaint ¶ 136 (same).

The underlying complaints further allege that the defendants there "concealed the dangers, promoted false and misleading information, sought to undermine public support for greenhouse gas regulation, and engaged in massive campaigns to promote the ever-increasing use of their products at ever-greater volumes," *id.*, and that, "[b]ut for such [denialist] campaigns, climate crisis impacts in the [counties] would have been substantially mitigated or eliminated altogether." *Maui* complaint ¶ 9; *Honolulu* complaint ¶ 9. Thus, the crux of the underlying lawsuits is that Aloha disregarded known risks of harm to the counties when selling its fuel products that would inevitably combust and produce greenhouse gases, thereby changing the climate and injuring the counties. Some of the specific harms alleged include "injury or destruction of [c]ounty-owned or operated facilities critical for operations, utility services, and risk management, as

well as other assets"; "increased planning and preparation costs for community adaptation and resiliency"; "decreased tax revenue"; and "others."  *Maui* complaint ¶¶ 9–11; *Honolulu* complaint ¶¶ 9–11.

Regarding climate change itself, the underlying complaints allege that "ocean and atmospheric warming is overwhelmingly caused by anthropogenic greenhouse gas emissions."  *Maui* complaint ¶ 41; *Honolulu* complaint ¶ 35.  "As greenhouse gases accumulate in the atmosphere," they state, "the Earth radiates less energy back to space."  *Maui* complaint ¶ 49; *Honolulu* complaint ¶ 40. According to the underlying complaints, "[t]his accumulation and associated disruption of the Earth's energy balance have myriad environmental and physical consequences, including, but not limited to," warming surface temperatures, rising sea levels, intensifying weather events, and increasing erosion, floods, and wildfires.  *Id.*

The counties allege five causes of action in the underlying lawsuits.  The first two are public nuisance and private nuisance.  *Maui* complaint ¶¶ 204–21; *Honolulu* complaint ¶¶ 155–73.  Those two claims focus on the defendants' "affirmative[] and knowing[]" acts and omissions despite the "known and foreseeable risk of climate change and its consequences."  *See Maui* complaint ¶ 207; *Honolulu* complaint ¶ 157.  The third and fourth claims are "strict liability" failure to warn, and "negligent" failure to warn claims, respectively.  *Maui*

complaint ¶¶ 222–46; *Honolulu* complaint ¶¶ 174–99.  Those two claims assert

that the defendants "knew or should have known . . . of the climate effects

inherently caused by the normal use and operation of their fossil fuel products."

*See, e.g.*, *Maui* complaint ¶¶ 225–26, 237–38; *Honolulu* complaint ¶¶ 177–78,

189–90.  The fifth and final claim is the trespass claim, which asserts that the

defendants "intentionally, recklessly, or negligently caused flood waters, extreme

precipitation, saltwater, and other materials, to enter the [counties'] real property."

*Maui* complaint ¶ 249; *Honolulu* complaint ¶ 201.

## B.    Procedural History

In June 2023, the parties cross-moved for summary judgment on whether a

duty to defend existed under any of the twelve policies.  *See* ECF Nos. 54, 56.[2]

The arguments centered around whether:  (1) the underlying lawsuits alleged harm

caused by an "occurrence," i.e., an "accident" as required for coverage under the

policies and (2) the pollution exclusion in ten of the polices precluded coverage.

AIG argued that the underlying lawsuits alleged knowing or intentional conduct

rather than an accident, *see* ECF No. 56-1 at 15–19, and that greenhouse gases

constituted pollutants within the meaning of the exclusion.  The Court held a

---

[2]  The parties also dispute indemnification, but that question isn't before the Court.
*See* ECF 56-1 at 10 ("At the parties' request, the Court deferred discovery on the
duty to indemnify until after the duty to defend issues are resolved." (citing ECF
Nos. 38, 46, 51)).

hearing on August 24, 2023, *see* ECF No. 68, but rather than rule on the motions,

the Court certified questions to the Hawaiʻi Supreme Court and stayed the matter

pending their resolution, *see* ECF No. 70.

The two certified questions operated sequentially. First, the Court asked:

> 1) For an insurance policy defining a covered "occurrence" in part as an "accident," can an "accident" include recklessness?

ECF No. 70 at 2. If the answer was "yes," the Court had a second question:

> 2) For an "occurrence" insurance policy excluding coverage of "pollution" damages, are greenhouse gases "pollutants," i.e., "gaseous" "irritant[s] or contaminant[s], including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste"?

*Id.* at 2, 15.

The Hawaiʻi Supreme Court accepted the certified questions and answered

both in the affirmative—meaning that an "occurrence" policy could cover damages

that arose from recklessness, but that the pollution exclusion precluded coverage

under those policies with that provision. *See Aloha Petroleum, Ltd. v. Nat'l Union

Fire Ins. Co. of Pittsburgh*, 155 Hawaiʻi 108, 557 P.3d 837 (2024) ("*Aloha

Petroleum*").

After the opinion, and back in this Court, the parties nevertheless disputed

the ruling's effect on the instant case. *See* ECF No. 104. Aloha eventually decided

it would not raise new arguments as to the duty to defend under the ten policies

with pollution exclusions, but asserted that the Court would still need to determine

whether AIG had a duty to defend under the two policies lacking the exclusion. *See id.* at 2–6; ECF No. 112.

The Court informed the parties that it would first rule on the previously filed cross-motions for summary judgment only as to the duty to defend under the ten policies with the pollution exclusion. *See* ECF No. 112. It also invited renewed motions for summary judgment as to the duty to defend under the two remaining policies. *See id.* Those motions are now before the Court and have been fully briefed. *See* ECF No. 113 (NUFIC Motion); ECF No. 114 (Aloha Motion); ECF No. 119 (Aloha Opposition); ECF No. 120 (NUFIC Opposition).

After the parties filed their renewed cross-motions on the two policies, the Court issued its order denying in part Aloha's motion for partial summary judgment and granting in part AIG's partial motion for summary judgment regarding the ten policies. *See* ECF No. 118. In accordance with *Aloha Petroleum*, the Court concluded that AIG had no duty to defend Aloha in the underlying lawsuits based on the ten policies with the pollution exclusions. The Court now turns to the two remaining policies.

## C.    The Pertinent NUFIC Policies

NUFIC issued the two policies remaining in this case in 1986 and 1987. *See* ECF No. 116 ¶ 4 (NUFIC Concise Statement of Material Facts); ECF No. 121 at 3 (Aloha admitting ¶ 4); *see also* ECF No. 55-4 (1986 Policy); ECF No. 55-5 (1987

Policy).  The policies provide that NUFIC:

> [W]ill pay on behalf of the **Insured** [Aloha] all sums which the
> **Insured** shall become legally obligated to pay as damages
> because of
>
>> A. **bodily injury** or
>>
>> B. **property damage**
>
> to which this insurance applies caused by an **occurrence** and
> [NUFIC] shall have the right and duty to defend any suit against
> the **Insured** seeking damages on account of such **bodily injury**
> or **property damage.**

*See* ECF No. 116 ¶ 7 (NUFIC Concise Statement of Material Facts) (emphasis in

original); ECF No. 121 at 3 (Aloha admitting ¶ 7).

Both policies require an "occurrence" as a condition for coverage.  ECF No.

115 ¶ 9 (Aloha's Separate and Concise Statement of Facts); ECF No. 122 ¶ 9

(NUFIC noting the fact as undisputed).  An "occurrence" is defined as "an

accident, including continuous or repeated exposure to conditions, which results in

bodily injury or property damage neither expected nor intended from the

standpoint of the insured."  ECF No. 115 ¶ 9 (Aloha's Separate and Concise

Statement of Facts); ECF No. 122 ¶ 9 (NUFIC noting the fact as undisputed).

The policies define "property damage" in relevant part as "physical injury to

or destruction of tangible property which occurs during the policy period,

including the loss of use thereof at any time resulting therefrom."  ECF No. 115

¶ 10 (Aloha's Separate and Concise Statement of Facts); ECF No. 122 ¶ 10
(NUFIC noting the fact as undisputed).

## II.    LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment as
a matter of law." Fed. R. Civ. P. 56(a). In insurance suits, opposing parties often
cross-move for summary judgment on the same coverage issue that is purely legal
in nature, i.e., the material facts are not in dispute. *See, e.g.*, *Burlington Ins. Co. v.
Oceanic Design & Const., Inc.*, 383 F.3d 940, 945 (9th Cir. 2004); *Nat'l Union
Fire Ins. Co. of Pittsburgh, PA v. Seagate Tech., Inc.*, 2013 WL 1282971, at *1
(N.D. Cal. Mar. 27, 2013). The court should decide those cross-motions by
determining whether the insurance policy provides, or does not provide, coverage
as a matter of state law. *See Nautilus Ins. Co. v. Hawk Transp. Servs., LLC*, 792 F.
Supp. 2d 1123, 1131 (D. Haw. 2011). For each cross-motion, the moving party
has the burden of persuading the court that it is entitled to judgment as a matter of
law. *See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,
1102 (9th Cir. 2000).

## III.    DISCUSSION

The Court begins with a summary of Hawaiʻi law on the interpretation of
insurance contracts and on an insurer's duty to defend.

A.    **Hawaiʻi Law—Interpreting Insurance Contracts, and the Duty to Defend**

Under Hawaiʻi law, insurance policies are treated as contracts that must be interpreted in favor of the insured:

> [I]nsurance policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended.    Moreover, every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy.
>
> Nevertheless . . . because insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer.  Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson.

*Tri-S Corp. v. W. World Ins. Co.*, 110 Hawaiʻi 473, 489, 135 P.3d 82, 98 (2006) (quoting *Dairy Rd. Partners v. Island Ins. Co.*, 92 Hawaiʻi 398, 411, 992 P.2d 93, 106 (2000)).

"It is well settled that the duty to provide coverage and the duty to defend on the part of an insurer are separate and distinct." *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawaiʻi, Ltd.*, 76 Hawaiʻi 277, 291, 875 P.2d 894, 908 (1994) ("*Sentinel*"). "The obligation to defend is broader than the duty to pay claims and arises wherever there is the mere *potential* for coverage.  In other words, the duty to defend rests primarily on the *possibility* that coverage exists.  This possibility may

11

be remote but if it exists, the insurer owes the insured a defense." *Tri-S Corp.*, 110 Hawai'i at 488, 135 P.3d at 98 (editorial marks omitted) (quoting *Dairy Rd.*, 92 Hawai'i at 412, 992 P.2d at 107).

Hence, for NUFIC's Motion, it has the burden to prove—i.e., to persuade as the movant—that "it would be *impossible* for the [counties] to prevail against [Aloha] in the underlying lawsuit[s] on a claim covered by the [NUFIC] policies." *Id.* (editorial marks omitted) (quoting *Dairy Rd.*, 92 Hawai'i at 412–13, 992 P.2d at 107–08). "Conversely, [Aloha's] burden with respect to its [Motion] is comparatively light, because it has merely to prove that a *possibility* of coverage exists." *Id.* (editorial marks omitted) (quoting *Dairy Rd.*, 92 Hawai'i at 412–13, 992 P.2d at 107–08). For both Motions, "[a]ll doubts as to whether a duty to defend exists are resolved against [NUFIC] and in favor of [Aloha]." *Sentinel*, 76 Hawai'i at 287, 875 P.2d at 904 (citation omitted) (affirming the grant of an insured's motion for summary judgment on the issue of duty to defend).

"Hawaii adheres to the 'complaint allegation rule'" for duty to defend inquiries. *Burlington*, 383 F.3d at 944 (quoting *Pancakes of Haw., Inc. v. Pomare Props. Corp.*, 85 Hawai'i 286, 944 P.2d 83, 88 (App. 1997)). "The focus is on the alleged claims and facts." *Id.*; *see also Dairy Rd.*, 92 Hawai'i at 417, 992 P.2d at 112 (holding that a duty-to-defend analysis is generally limited to the "four corners" of the underlying complaint). Factual allegations are particularly

important in triggering a duty to defend, for "when the *facts* alleged in the

underlying complaint unambiguously exclude the possibility of coverage,

conclusory assertions contained in the complaint regarding the legal significance of

those facts . . . are insufficient to trigger the insurer's duty to defend." *Dairy Rd.*,

92 Hawai'i at 417, 992 P.2d at 112. "The duty to defend includes mixed actions

where some claims are covered and others are not. If one allegation in the

complaint is potentially covered, the insurer must defend the whole lawsuit."

*Aloha Petroleum*, 155 Hawai'i at 118, 557 P.3d at 847 (citing *St. Paul Fire &*

*Marine Ins. Co. v. Bodell Constr. Co.*, 153 Hawai'i 381, 384, 538 P.3d 1049, 1052

(2023)).

**B.      The Court's Previous Discussion of the Policies**

As an initial matter, NUFIC argues that the Court has already necessarily

concluded that there is no duty to defend under the two policies because it certified

the pollution exclusion question as "determinative" to the Hawai'i Supreme Court.

ECF No. 113-1 at 10–12. In NUFIC's reasoning, the Court could not have

certified the pollution exclusion question as determinative if there was any

possibility of coverage under the two policies that lacked the exclusion. *See id.*

NUFIC further asserts that the Court, by citing the potential issue in its order

certifying questions to the Supreme Court, *must have* concluded that there was no

duty to defend under those policies.  Because of this, NUFIC contends that Aloha's

position amounts to a "request for reconsideration."  *Id.* at 12–13.

What the Court actually said, however, refutes NUFIC's position.  In full,

the Court stated:

> One final housekeeping note:  two of the AIG policies lack
> pollution exclusions. That fact does not make the second certified
> question nondeterminative, however, despite the rule that an
> insurer must defend an entire suit if there is potentially coverage
> for a legal claim under at least one policy.  The two AIG policies
> lacking pollution exclusions have coverage periods ranging
> between February 1986 and January 1988, and the underlying
> lawsuits *sparsely allege* damages occurring before 2000, much
> less during the 1980s.  So coverage under those two policies is
> *apparently* not possible, making their lack of a pollution
> exclusion immaterial.  The AIG policies with later coverage
> periods, e.g., 2007 through 2010, are much more likely to
> correspond with allegations of contemporaneous damage in the
> underlying lawsuits.

ECF No. 70 at 19–20 (emphases added).  While casting doubt on the applicability

of the earlier NUFIC policies, the Court nonetheless used non-committal language

because it wasn't definitively concluding anything on the matter.  As explained in

its order on the earlier cross-motions for summary judgment, "[t]he Court didn't

intend to rule on that issue, but rather meant to emphasize the significance of the

pollution exclusion question."  ECF No. 118 at 12–13.

The Hawai'i Supreme Court also recognized that the duty to defend under

the two policies remained an open question for this Court to consider.  It

commented:

14

> Whether Aloha is ultimately entitled to a defense under the 1986 and 1987 policies is a question for the District Court. To award coverage under those policies, the District Court must find that the counties' complaint alleges property damage during the policies' coverage period . . . We leave it to the District Court to find whether these "sparse" damage allegations create a possibility of coverage, something it so far said is "apparently" not possible.

*Aloha Petroleum*, 155 Hawai‘i at 124, 557 P.3d at 853.

In sum, the Court never decided the issue and Aloha's motion on these policies doesn't constitute a request for reconsideration. Because the issue remains live, the Court turns to it now.

## C.    Duty to Defend Analysis:  The Possibility of Coverage

The parties generally agree about the key decision points for the Court regarding the duty to defend under the 1986 and 1987 policies. First, the Court will consider whether the underlying lawsuits allege an "occurrence," i.e., an "accident" covered under the policies. Although the Court previously signaled that if an accident could include reckless behavior, then the underlying lawsuits likely alleged an occurrence covered under the policies, *see* ECF No. 70 at 11, the Court confirms as much here based on the standard the Hawai‘i Supreme Court articulated in *Aloha Petroleum*. Second, the Court analyzes whether the underlying lawsuits allege possible property damage during the policy periods and concludes that they do. This second inquiry involves considering whether allegations of greenhouse gas emissions equate to allegations of tangible property

15

damage, and whether there are specific allegations of property damage. Third, the Court addresses whether the underlying lawsuits seek damages for that property damage, and concludes they do.

### 1.    An Occurrence

NUFIC argues that the underlying complaints do not allege an "occurrence" because Aloha either knew or expected harm with practical certainty. *See* ECF No. 113-1 at 25–28. Aloha responds that some allegations in the complaints are "couched in terms of the possibility of harm taking place—and hence not sufficient under the 'practically certain' standard that would preclude coverage." ECF No. 120 at 29. The Court concludes that the underlying complaints possibly allege an "occurrence" under the Hawai'i Supreme Court's recently clarified standard. *See Aloha Petroleum*, 155 Hawai'i at 111–12, 557 P.3d at 840–41. "[I]t bears repeating that the duty to defend rests primarily on the *possibility* that coverage exists," and that where a complaint alleges claims that could be supported by evidence of intentional or reckless conduct, a duty to defend attaches. *See Tri-S Corp.*, 110 Hawai'i at 493–94, 135 P.3d at 102–03.

In answering the Court's certified question regarding whether recklessness can be an accident and thus an occurrence, the Hawai'i Supreme Court explained, "[a]wareness of risk differs from awareness of certain harm. Insurance covers risks. Per *Tri-S*, we hold that covered 'accidents' differ from non-covered

16

expected or intended injuries when the harm was intended or practically certain."
*See Aloha Petroleum*, 155 Hawaiʻi at 118, 557 P.3d at 847.  In other words, when
an insured acts with the knowledge of a possible or even a probable risk, that could
be an accident.  *See id.*, 155 Hawaiʻi at 119, 557 P.3d at 848.  But, "[w]hen the risk
crosses the line into 'practical certainty,' it is no longer an 'accident.'"  *Id.*  Courts
consider whether the risk is practically certain from the insured's subjective point
of view.  *See id.*, 155 Hawaiʻi at 120, 557 P.3d at 849 (citing *Tri-S*, 110 Hawaiʻi at
494 n.8, 135 P.3d at 103 n.8).

The Court thus examines whether the underlying complaints only allege that
Aloha expected harm with practical certainty, or whether they possibly assert
claims based on less certain knowledge.  Although the Court has recognized that
some allegations in the underlying lawsuits sound in a more culpable mental state
than recklessness, *see* ECF No. 70 at 11, the Court concludes that many of the
allegations could suggest that Aloha acted with less than practical certainty of
harm, and that coverage under the NUFIC policies is therefore possible.

The Court highlights some of the allegations that speak of possible,
potential, or conditional harm.  The first paragraph of both underlying complaints
is indicative:

> Defendants, major corporate members of the fossil fuel industry,
> have known for nearly half a century that unrestricted production
> and use of their fossil fuel products create greenhouse gas
> pollution that warms the planet and changes our climate.  They

> have known for decades that those *impacts could be catastrophic*
> and that only a narrow window existed to take action before the
> consequences would be irreversible.

*Honolulu* complaint ¶ 1; *Maui* complaint ¶ 1 (emphasis added). That single

allegation speaks about knowledge but also *possible* catastrophic consequences.

Such an allegation leaves room for the conclusion that Aloha did not know the

effects of global warming with practical certainty. And, at least in the early years,

the scientific reports that the complaints cite discuss potential or possible effects

from warming. *See, e.g.*, *Honolulu* complaint ¶ 51–52 (discussing the 1950s).

Similarly, a cited paper from the 1980s also discussed that "warming *can* have

serious consequences." *Id.* ¶ 73. Such allegations, couched in non-certain terms,

support that it is *possible* that Aloha could be found liable for an accident.

Further, although the facts alleged in the underlying complaints are the most

critical, it is worth noting that the underlying lawsuits assert claims that sound in

negligence and recklessness. *See, e.g.*, *Maui* complaint ¶¶ 225–26, 237–38;

*Honolulu* complaint ¶¶ 177–78, 189–90. Several times throughout the underlying

complaints, the counties alleged that the underlying defendants "knew or *should

have known*" that their actions would have negative impacts. *See, e.g.*, *Honolulu*

complaint ¶ 162. Like the insured in *Tri-S*, there is at least a remote possibility that

Aloha could be found liable based solely on actions it took being less than

practically certain that harm would occur. The Court concludes that the underlying

lawsuits possibly allege an occurrence.[3]

### 2.    Alleged Property Damage During Policies' Terms

The parties recognize that for coverage to attach under the policies, the property damage giving rise to potential liability must take place during the policy periods. *See* ECF No. 114-1 at 19; ECF No. 119 at 9. Collectively, the NUFIC policies ran from February 1, 1986 to February 1, 1988. Thus, to establish a duty to defend, Aloha must demonstrate that the underlying complaints possibly allege property damage during that period. The parties diverge on what constitutes property damage, however. Aloha first argues that allegations of emissions of greenhouse gasses during the policy periods are sufficient to demonstrate possible coverage for property damage under the "continuous injury trigger" theory. Aloha then directs the Court to what it characterizes as explicit dated allegations of property damage during the policy periods. Finally, it argues that the generalized

---

[3] NUFIC repeatedly asserts that the sole basis of Aloha's liability in the underlying lawsuits is an intentional and "sophisticated disinformation campaign" that didn't begin until the 1990s. *See, e.g.*, ECF No. 113-1 at 21. NUFIC suggests this means that the underlying complaints don't allege an "occurrence," *see* ECF No. 119 at 28, and that any property damage must have occurred after the policies' periods, *see* ECF No. 113-1 at 21. But the underlying complaints belie that the lawsuits are so limited; rather they clearly challenge the act of emissions in addition to the underlying defendants' alleged coverup efforts. *See, e.g.*, *Honolulu* complaint ¶¶ 43–48 (describing how the underlying defendants' "fossil fuel products released a substantial percentage of anthropogenic greenhouse gases to the atmosphere between 1965 and the present," and how that led to climatic effects and the underlying plaintiffs' alleged harms).

undated allegations of property damage in the underlying lawsuits are sufficient to establish a duty to defend. As discussed below, the Court is skeptical that allegations of emissions equate to allegations of property damage, but ultimately declines to decide the issue because it isn't necessary to resolve the Motions and the Hawai'i Supreme Court hasn't addressed the matter head on. Regardless, the Court finds that the underlying lawsuits possibly allege property damage during the policies' terms.

### a. Emissions as Property Damage

Aloha argues that allegations of emissions of greenhouse gases are in and of themselves sufficient to establish the possibility of property damage during the relevant period. *See* ECF No. 114-1 at 18–20. It bases its argument on the Hawai'i Supreme Court's conclusion that greenhouse gasses cause harm to the atmosphere upon emission, and thus constitute traditional pollution. *See id*. NUFIC responds that harm to the atmosphere or environment doesn't trigger coverage under the policies because they require "physical injury to or destruction of *tangible property*." ECF No. 119 at 9 (citation omitted) (emphasis added); *see also* ECF No. 115 ¶ 10 (Aloha's Separate and Concise Statement of Facts); ECF No. 122 ¶ 10 (NUFIC noting the fact as undisputed). NUFIC further stresses that the emission of greenhouse gasses is just the first step in a series of effects that may eventually cause damage to tangible property: "[a]s [greenhouse gasses]

accumulate in the atmosphere, more heat is trapped, the Earth gets hotter, this has a
'cascading' effect on the Earth's climate, and that eventually causes significant
problems, including more frequent and severe weather events that result in various
harms—including *property damage*." ECF No. 119 at 11–12 (citation omitted)
(emphasis is original). Thus, NUFIC argues that emission is distinct from property
damage.

In support of its argument that allegations of emissions equate to allegations
of property damage, Aloha relies on *Aloha Petroleum*'s discussion of the pollution
exclusions in the other ten AIG policies. *See* ECF No. 114-1 at 18–20; ECF No.
120 at 14–16. But Aloha stretches the opinion further than it can bear. The
Hawaiʻi Supreme Court interpreted the pollution exclusions to cover only
"traditional environmental pollution," in contrast with some courts that read the
exclusions literally (which results in a much broader exclusion). *See Aloha
Petroleum*, 155 Hawaiʻi at 124–26, 557 P.3d at 853–55. It explained that
"[t]raditional environmental pollution has three main features: (1) the release of a
damaging substance, (2) into the environment, (3) that causes harm because of its
presence in the environment." *Id.*, 155 Hawaiʻi at 126, 557 P.3d at 855. Applying
that test, the Supreme Court concluded, "Aloha's gasoline produces [greenhouse
gases]. These gases accumulate in the atmosphere and trap heat. Because they are
released into the atmosphere and cause harm due to their presence in the

21

atmosphere, [greenhouse gases] are pollutants." *Id.* Further discussing the impacts of climate change, the Supreme Court noted that greenhouse gases "cause environmental damage because of their presence in the environment." *Id.*

But the foregoing says nothing about *when* greenhouse gases cause harm to *tangible property*. And, "under an occurrence policy, the event that triggers potential coverage is the sustaining of actual damage by the complaining party and not the date of the act or omission that caused the damage. Simply stated, the relevant focus under an occurrence policy is on the *effect,* not the *cause.*" *Sentinel*, 76 Hawai'i at 288, 875 P.2d at 905 (citation omitted). To fill the gap between emission and property damage, Aloha directs the Court to a "continuous injury trigger" theory of determining when property damage occurs for the purpose of insurance coverage in cases where there this a long-term or developing damage process. ECF No. 120 at 18–19.

The Hawai'i Supreme Court has explained the continuous injury trigger applies in cases where the injury isn't a singular event:

> Particular difficulty has been encountered when an injury process is not a definite, discrete event—for example, where the damage continues progressively over time spanning different insurer's policy terms. In this situation, courts have invoked an equitable "continuous injury" trigger of coverage. Under this theory, property damage is deemed to have "occurred" continuously for a fixed period (the "trigger period"), and every insurer on the risk at any time during that trigger period is jointly and severally liable to the extent of their policy limits, the entire loss being equitably allocated among the insurers. *The trigger period*

> *begins with the inception of the injury and ends when the injury ceases.*

*Sentinel*, 76 Hawaiʻi at 298, 875 P.2d at 915 (citations omitted) (emphasis added). A party seeking to apply the continuous injury trigger must "establish[] that: (1) some kind of property damage occurred during the coverage period of each policy under which recovery is sought; and (2) the property damage was part of a continuous and indivisible process of injury." *Id.* (citation omitted). The Supreme Court ultimately endorsed the continuous injury trigger "where injury-in-fact occurs continuously over a period covered by different insurers or policies, and actual apportionment of the injury is difficult or impossible to determine[.]" *Id.*, 76 Hawaiʻi at 300, 875 P.2d at 917.

Aloha argues that the continuous injury trigger applies because the underlying lawsuits allege long-term, continuous damage from the emission of greenhouse gasses. *See* ECF No. 120 at 18. But just because greenhouse gas emissions cause climate change, which can lead to progressive property damage, it doesn't follow that therefore emissions *are* property damage or that they trigger the beginning of the continuous injury period. As *Sentinel* also stated, "the focus under an occurrence policy is on the *effect,* not the *cause.*" 76 Hawaiʻi at 288, 875 P.2d at 905 (citation omitted).

Focusing on the effect better accords with the policies' definition of "property damage," which requires "physical injury to or destruction of *tangible*

property."  ECF No. 115 ¶ 10 (Aloha's Separate and Concise Statement of Facts) (emphasis added); ECF No. 122 ¶ 10 (NUFIC noting the fact as undisputed). Interpreting allegations of emissions to equate to property damage would contradict the plain meaning of "tangible."  *See* ECF No. 119 at 11 (citing 3 Insurance Claims and Disputes § 11:1 (6th ed.) ("[T]angible property is property that can be touched, or property capable of being possessed.")).  Still, the Court is hesitant to rule definitively because it recognizes that the Hawaiʻi Supreme Court concluded that greenhouse gasses are damaging to the environment and atmosphere upon emission, *Aloha Petroleum*, 155 Hawaiʻi at 124, 557 P.3d at 853, and that *Sentinel* doesn't foreclose the possibility of mere exposure to a harmful substance triggering the continuous injury period, 76 Hawaiʻi at 300, 875 P.2d at 917.

The Court thus turns to the underlying complaints' allegations of tangible property damage.

### b.  Dated Allegations of Possible Property Damage

Even setting aside allegations that only discuss emissions of greenhouse gasses, there are assertions of property damage that warrant further analysis. Aloha divides the allegations of property damage in the underlying lawsuits into two categories:  those dated during the policies' terms and those undated, which may nevertheless still have occurred during the relevant period.  *See* ECF No. 114-

1 at 21–27; ECF No. 120 at 19–22 (dated allegations), 22–23 (undated allegations).

The Court addresses the dated allegations first but notes that the dated allegations

don't specifically address the two-year period of the policies' terms.  Instead, the

allegations assert a continuing and escalating harm that began before the 1980s.

Aloha highlights one dated allegation in the *Honolulu* complaint.  The Court

extensively cites the allegation for context:

> 150.    Plaintiffs already have incurred, and will foreseeably
> continue to incur, injuries and damages due to Defendants'
> conduct, its contribution to the climate crisis, and the
> environmental, physical, social, and economic consequences of
> the climate crisis's impact on the environment. As a result of
> Defendants' wrongful conduct described in this Complaint,
> Plaintiffs have, are, and will experience significant adverse
> impacts attributable to Defendants' conduct, including but not
> limited to:
>
> . . .
>
> b.    Plaintiffs are already experiencing sea level rise and
> associated impacts, and will experience significant additional
> sea level rise over the coming decades through at least the end
> of the century. Plaintiffs are particularly vulnerable to the
> impacts of sea level rise because of its substantial developed
> coastline and substantial low-lying areas, particularly along
> the south coast of Oʻahu . . . *High tide flooding in the County
> has substantially increased since the 1960s. The City has
> already lost 25% of its beaches to the erosive force of rising
> seas, the increased frequency and power of storm surges, and
> aggravated wave run-up and impacts, and those losses
> continue to mount. Native Hawaiian cultural sites, built
> structures, natural resources, infrastructure including roads,
> sewerage, and beach parks, and other resources are more
> frequently flooded and, in some cases, inundated.*

*See Honolulu* complaint ¶ 150.b (emphasis added).  In short, flooding in coastal areas has increased since the 1960s, eroded beaches, and inundated certain property.

Aloha characterizes the foregoing as "unambiguous allegations of sea level rise and flooding taking place on the island during the decade of the 1980's," and thus allegations of possible property damage.  ECF No. 120 at 20.  NUFIC responds that while flooding and "the erosion of beaches, which results in sand moving from one spot to another," *may* result in property damage, they are not in and of themselves destruction of tangible property.  *See* ECF No. 113-1 at 22; ECF No. 119 at 15 n.3.  But in opposition, Aloha directs the Court to the underlying lawsuits' allegations of damage from trespass.  *See* ECF No. 120 at 21 (citing *Honolulu* complaint ¶ 203; *Maui* complaint ¶ 251).  Those allegations basically assert that the counties have suffered injury because of entry onto their real property of floodwaters, saltwater and other materials.  *See Honolulu* complaint ¶ 203; *Maui* complaint ¶ 251.  This, Aloha contends, demonstrates that the underlying plaintiffs view flooding as property damage.  *See* ECF No. 120 at 21.

Further, Aloha stresses that saltwater intrusion causes corrosion, which itself is a form of property damage.  *See* ECF No. 114-1 at 24 (citing *Honolulu* complaint ¶ 150.c); ECF No. 120 at 21 n.13 (citing NUFIC's argument to Hawai'i Supreme Court that greenhouse gasses were contaminants under the pollution

exclusion because saltwater intrusion causes damage to freshwater resources). The *Honolulu* complaint asserts that low-lying areas are at risk of increased future damage "including but not limited to freshwater supply pipelines that are subject to higher levels of corrosion due to saltwater intrusion; and wastewater infrastructure." *Honolulu* complaint ¶ 150.b. It also alleges that "[s]altwater intrusion and coastal erosion due to sea level rise has further reduced available freshwater resources and damages drinking water delivery infrastructure, including by corrosion and inundation." *Id.* ¶ 150.c.

NUFIC diminishes the import of these allegations, arguing that they refer to more recent damage like a broken water main in 2018. *See* ECF No. 119 at 15–16. But NUFIC's arguments fail to persuade. Common knowledge dictates that corrosion is a process that develops over time. The rupture of a water main in 2018 is merely the ultimate outcome of that injurious process. Just because a water main didn't burst until 2018 doesn't mean that it didn't sustain damage before then. Additionally, the underlying complaints' allegations of recent dramatic damages serve merely as examples and don't limit the scope of the potential liability that Aloha faces. In short, allegations of historical high tide flooding raise the possibility that saltwater inundated infrastructure and began or exacerbated the corrosive process during the policy periods.

The Court thus concludes that allegations that sea level has been rising since the 1960s, causing flooding, and inundating low-lying property are sufficient to raise the potential or possibility of coverage under the NUFIC policies.  While it's true that the *Honolulu* complaint neither alleges exactly when the flooding took place nor precisely how it damaged property, it does contend that ocean water has been inundating property with increasing regularity since the 1960s and through the policies' periods.  Under Hawai'i's "stout" duty to defend, the insurer owes a defense under a policy even when there is only a "remote" possibility of coverage. *See Aloha Petroleum*, 155 Hawai'i at 118, 557 P.3d at 847 (citing *St. Paul Fire and Marine Ins. Co.*, 153 Hawai'i at 383, 538 P.3d at 1051).  Such allegations clearly raise the possibility that covered damage possibly occurred during the relevant period.

NUFIC's argument to the contrary—that flooding does not necessarily cause property damage—is unpersuasive, particularly when NUFIC's burden at this stage is to demonstrate that coverage is *impossible*.  Even if a flood isn't technically inherently damaging, it at least suggests damage like corrosion.

The *Maui* complaint, however, doesn't include the same allegation about high tide flooding since the 1960s, so the Court considers the undated allegations in the *Maui* complaint.

28

### c.  Undated Allegations of Possible Property Damage

Aloha directs the Court to undated allegations of property damage in three

paragraphs of the *Maui* complaint that it argues establish a possibility of coverage:

> 54. Defendants' conduct caused a substantial portion of global atmospheric greenhouse gas concentrations, and the attendant historical, projected, and committed disruptions to the environment—and consequent injuries to the County—associated therewith.
>
> 160. Defendants' individual and collective conduct . . . is a substantial factor in causing global warming and consequent sea level rise and attendant flooding, erosion, and beach loss in the County; increased frequency and intensity of extreme weather events in the County, including hurricanes and tropical storms, "rain bomb" extreme precipitation events, drought, heatwaves, wildfires, and others; ocean warming and acidification that will injure or kill coral reefs in the County's waters; habitat loss of endemic species in the County, and range expansion of invasive and disease carrying-pest species; diminished availability of freshwater resources; and the cascading social, economic, and other consequences of those environmental changes. These adverse impacts will continue to increase in frequency and severity in the County.
>
> 198.  The County's property and resources have been and will continue to be inundated and/or flooded by sea water and extreme precipitation, among other climate-change related intrusions, causing injury and damages thereto and to improvements thereon, and preventing free passage on, use of, and normal enjoyment of that real property, or permanently destroying them. For instance, sea level rise is both inundating and accelerating beach loss at County's network of beach parks, effectively eliminating portions of those vital community resources which are also critical drivers of the County's ocean- and tourism-based economy.

ECF No. 114-1 at 31.

NUFIC argues (1) that while the foregoing allegations describe consequences that "may ultimately lead to property damage, none is property damage itself," ECF No. 119 at 14; and (2) that other allegations in the complaint suggest that any damage took place after the policy periods, *see id.* at 15–16.  Both contentions fail in light of the "stout" duty to defend.

As to NUFIC's first argument, the Court rejects it for the same reason it rejected the contention regarding coastal flooding in Honolulu County since the 1960s.  Namely, allegations of saltwater flooding of property strongly suggest— even if they don't necessarily establish—harm to tangible property, such as via corrosion.  Like the allegations in the *Honolulu* complaint, the undated allegations in the *Maui* complaint assert that the underlying plaintiffs have already suffered historical harm from climatic changes, including flooding and the like.  These allegations at least raise the possibility that the underlying plaintiffs suffered harm to physical property during the policies' terms.  Certainly, there is nothing in those allegations that demonstrate that coverage is impossible, as NUFIC must establish.

NUFIC's second argument is basically that context matters when considering the allegations.  The Court agrees with the principle, but concludes that context suggests coverage might be possible, rather than impossible as NUFIC contends.  NUFIC directs the Court to a host of allegations about historical scientific analyses that predicted that the effects of climate change would start to

be noticeable around the turn of the 21st century. *See* ECF No. 113-1 at 21–22.
For example, NUFIC cites allegations that "by 1965, Defendants and their
predecessors-in-interest were aware that the scientific community had found that
fossil fuel products, if used profligately, would cause global warming by the end of
the century, and that such global warming would have wide-ranging and costly
consequences." *Honolulu* complaint ¶ 55; *see* ECF No. 119 at 17 (citing the
allegation). Similarly, the *Honolulu* complaint asserts that a 1968 assessment
stated that "[s]ignificant temperature changes are almost certain to occur by the
year 2000, and . . . there seems to be no doubt that the potential damage to our
environment could be severe." *Id.* ¶ 56. But such allegations don't prove that
climate effects only began after the NUFIC policy periods, rendering damage
during the periods impossible. The allegations merely describe predictions made
by scientists in the 1960s. Whether they were right or not and the onset date of
such effects may well be a fact issue in the underlying lawsuits. Allegations of
predictions from the 1960s don't foreclose the possibility of damages from effects
arising earlier than the estimates.

Further, other context supports Aloha in meeting its very light burden to
prove the possibility of coverage. For example, the underlying complaints are
filled with allegations of accelerating greenhouse gas emissions since the 1960s.
*See, e.g.*, *Honolulu* complaint ¶ 6; *Maui* complaint ¶ 6 ("The substantial majority

of all greenhouse gas emissions in history has occurred *since the 1950s*, a period

known as the 'Great Acceleration.'  About three quarters of all industrial CO2

emissions in history have occurred *since the 1960s*, and more than half have

occurred *since the late 1980s*.").  That the complaints allege that approximately

25% of all industrial CO2 emissions in history occurred between the 1960s and the

late 1980s at least raises the possibility that climate change effects began to

materialize during the policy periods, especially in light of the Hawaiʻi Supreme

Court's holding that emissions are immediately harmful to the environment.  *See*

*Aloha Petroleum*, 155 Hawaiʻi at 126, 557 P.3d at 855.

Other allegations also suggest that effects may have occurred during the

policies' terms.  Both complaints cite a 1990s study that demonstrates that sea

levels in Nova Scotia had "been rising over the past century."  *Honolulu* complaint

¶ 85; *Maui* complaint ¶ 94.  As discussed above, the *Honolulu* complaint alleges

increased high tide flooding since the 1960s.  *Honolulu* complaint ¶ 150.b.  The

proximity to Honolulu of the islands that comprise Maui County suggest that it

experienced the same flooding.  Further, in describing the consequences of global

warming, the *Maui* complaint alleges that global average air temperature has

already risen approximately one degree Celsius, *Maui* complaint ¶ 49.b, which can

lead to "[f]looding and inundation of land and infrastructure, increased erosion,

higher wave run-up and tides, increased frequency and severity of storm surges,

saltwater intrusion, and other impacts of higher sea levels," *id.* ¶ 49.c, and that

"these consequences . . . are already impacting the County, *id.* ¶ 50.  More directly,

the *Maui* complaint alleges that the "County's property and resources *have been*

and will continue to be inundated and/or flooded by sea water . . . causing injury

and damages thereto . . . For instance, sea level rise is both inundating and

accelerating beach loss at County's network of beach parks[.]"  *Id.* ¶ 198.

The specific examples of damage from around 2018 also allude to earlier

effects from erosion, storm surges, and wave run-up.  *See id.* ¶ 197.  For example:

> [I]n November 2018, the County temporarily repaired a 30-foot
> section of Lower Honoapiʻilani Road, which had been damaged
> by excessive runoff from upstream in the watershed, and sea-
> level-rise induced erosion in Kaʻopala Bay, which threatened
> water and sewage lines under the Road.  *The coastline there had
> already been degraded by sea-level rise and increasingly severe
> wave activity.*

*Id.* ¶ 197 (emphasis added).  Again, as with the water main in the *Honolulu*

complaint, just because the county had to act to mitigate effects in 2018, doesn't

mean that the damage didn't occur beforehand, and possibly during the policies'

terms.  Thus, rather than demonstrating that coverage is impossible under the

NUFIC policies, the context of the complaints suggests that it is at least possible

that damage to tangible property occurred during the 1980s.

In sum, the allegations in the underlying lawsuits—even excluding those that

assert only emissions—support the conclusion that covered property damage

possibly occurred during the NUFIC policies' terms.

### 3.    Possible Damages from Possible Property Damage

Aloha lastly argues that the underlying lawsuits seek damages for alleged property damage and thus there is a possibility of coverage.  *See* ECF No. 114-1 at 27–29.  The parties agree that the NUFIC policies require the insurer to cover "all sums which the [Aloha] shall become legally obligated to pay as damages *because of* . . . property damage."  *See* ECF No. 116 ¶ 7 (NUFIC Concise Statement of Material Facts) (emphasis added); ECF No. 121 at 3 (Aloha admitting ¶ 7).

If, as the Court has concluded, the underlying complaints possibly allege property damage during the policies terms, then there can be no real dispute that the underlying lawsuits possibly request damages "because of" that property damage.  Both complaints "seek judgment against those Defendants for:  1. Compensatory damages in an amount according to proof[.]"  *Honolulu* complaint Prayer for Relief ¶ 1; *Maui* complaint Prayer for Relief ¶ 1.  NUFIC attempts to cherry-pick allegations of tangible property damage that occurred well after the policy periods to suggest the underlying lawsuits' broad prayer for relief could not possibly seek remuneration for damage from the mid-1980s.  *See* ECF No. 119 at 18–19.  But, in light of the Court's conclusion above, NUFIC cannot plausibly argue that it is impossible that the underlying complaints' unqualified request for compensatory damages seek "damages because of property damage," such that the

possibility of coverage is foreclosed.

## IV.  CONCLUSION

For the foregoing reasons the Court GRANTS Aloha's Motion and DENIES

NUFIC's Motion.

Within 14 days of this Order, the parties must file a joint status report

regarding how the case will proceed.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, February 27, 2025.

Jill A. Otake
United States District Judge

CIV. NO. 22-00372 JAO-WRP, *Aloha Petroleum, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, et al.*; Order Granting Aloha's Motion for Partial Summary Judgment Regarding Duty to Defend, ECF No. 114, and Denying NUFIC's Supplemental Motion for Partial Summary Judgment, ECF No. 113.